Argued and submitted April 5, affirmed September 18, petition for rehearing denied October 30, 1984

## JAQUITH,
*Petitioner on Review,*

*v.*

## FERRIS et al,
*Respondents on Review.*

(TC 127,826; CA A26070; SC S30070)

687 P2d 1083

Michael C. McClinton, Salem, argued the cause for petitioner on review. With him on the petition and briefs was Clark, Marsh, Lindauer, McClinton & Vollmar, Salem.

J. Michael Alexander, Salem, argued the cause for respondents on review. With him on the briefs was Burt, Swanson, Lathen, Alexander & McCann, Salem.

ROBERTS, J.

## ROBERTS, J.

Plaintiff brought an action for damages on theories of negligence, fraud, breach of contract and unlawful trade practices. The trial court granted defendants' motion to dismiss on the basis that the claims were barred by the relevant statute of limitation.[1] The Court of Appeals affirmed the trial court in an *in banc* decision from which four members dissented. We affirm the Court of Appeals.

In December, 1977, plaintiff retained defendant Roy Ferris to list and sell approximately 47 acres of real property. In January, 1978, defendant found a potential buyer, Ron Jones & Co. On January 25, 1978, Jaquith and Jones signed an earnest money agreement to convey the property for $164,325, the amount Roy Ferris had represented to Jaquith as its fair market value.

In May, 1978, Jaquith discovered that the fair market value of the property was $400,000. She refused to proceed with the sale. Jones sued for specific performance on July 26, 1978. Jaquith's defense was to seek rescission of the agreement, claiming that the sale did not close by the date specified in the earnest money agreement. On motion for summary judgment, the trial court found the contract null and void. It entered its decree on March 23, 1979. Nineteen months later, on June 23, 1980, the Court of Appeals awarded summary judgment to Jones on a petition for reconsideration. *Jones v. Jaquith,* 46 Or App 671, 612 P2d 770, former opinion 44 Or App 727, 606 P2d 1179 (1980). Jaquith petitioned the Supreme Court for review. We denied review on September 23, 1980. *Jones v. Jaquith,* 289 Or 677 (1980). Subsequently, Jaquith conveyed her property to Jones. On July 15, 1981, within one year after review was denied, Jaquith filed this action.

Plaintiff claims that her cause of action did not accrue until she was forced to convey her property at a substantial loss pursuant to the Court of Appeals decision.

---

[1] ORS 12.110(1) provides:

"An action for assault, battery, false imprisonment, or for any injury to the person or rights of another, not arising on contract, and not especially enumerated in this chapter, shall be commenced within two years; provided, that in an action at law based upon fraud or deceit, the limitation shall be deemed to commence only from the discovery of the fraud or deceit."

Defendant contends that the cause of action accrued in May, 1978, when Jaquith learned the actual market value of her land. Both parties claim that *U.S. Nat'l Bank v. Davies,* 274 Or 663, 548 P2d 966 (1976) supports their respective positions. The majority opinion and the dissent in the Court of Appeals both discuss *Davies,* the majority distinguishing it and the dissent finding it applicable.

*Davies* was an action for legal malpractice resulting from the attorneys' advice to plaintiff's decedent regarding the sale of decedent's stock in a corporation. The attorneys advised decedent to accept trust funds of the corporation in payment for his stock. The corporation sued for return of the funds, alleging that the sale violated law and breached decedent's statutory fiduciary duties. Two years later the lawsuit was settled by payment to the corporation. The legal malpractice action followed. The issue there, as here, concerned when the cause of action accrued.

Although the *Davies* opinion devotes considerable discussion to the need for the occurrence of damage before a cause of action accrues, we acknowledged: "There is no doubt that decedent's necessity to defend the action caused him damage more than two years prior to the commencement of the present action." 274 Or at 668. The case was decided on the principle that a plaintiff, even though damaged, has no cause of action against anyone until the plaintiff becomes aware or should have become aware of the cause of his damage. *Davies* analyzed when decedent should have become aware that his lawyers might have been negligent in advising him about the stock payments. Defendants claimed that decedent's cause of action accrued as soon as decedent was sued by the corporation, or as soon thereafter as he could have obtained legal advice regarding the likely validity of the corporation's claims of illegal payments. We disagreed:

> "It is not so clear, however, that at that time [when decedent was sued] it could yet be determined that his expense of defense *was caused* by negligent advice by defendants. * * * In the present instance, if decedent had won the case brought against him, he would not normally be in a position to claim that negligent advice on the part of the present defendants was a cause of his expense of defense. * * * There is nothing about the filing of the claim against defendant together with the passage of any arbitrary lengths of time which, *as a matter*

*of law,* demonstrates that decedent should have been aware at a time which makes the claim vulnerable to the statute that his necessity to defend the action was caused by defendants' advice." 274 Or 668-69. (Emphasis in original.)

We also pointed out that had decedent filed a malpractice action earlier than he did, he would have been placed in the position of defending one action, claiming he had acted in conformance with the law, while simultaneously maintaining an action against defendants, claiming that he had not acted in conformance with the law because of faulty advice from defendant.[2] We concluded that common sense dictated that a "later event" (the likelihood of decedent's probable liability for the improper stock transfer) should take place before the statute commenced to run on decedent's malpractice action.

We considered these potential problems, but the crux of *Davies* is this: We were unwilling to hold decedent to awareness of his attorneys' malpractice until the litigation precipitated by the attorneys' advice was resolved. The resolution of the issue presented in the first action, the legality of the stock payments, would alert plaintiff to the existence or non-existence of a malpractice claim. If the stock payments were found legal, plaintiff would have no reason to believe a malpractice claim existed. If the stock payments were found to be illegal, decedent would then be aware that the propriety of his attorneys' advice was open to challenge.[3]

In the present case, when plaintiff was sued for specific performance, she defended by seeking rescission because the sale did not close by the specified date. Unlike the plaintiff in *Davies,* she makes no claim that some aspect of that suit triggered, for the first time, her knowledge of the improper land value or her realtor's possible negligence. To

---

[2] The defendants in this case point out that these perceived tactical problems may be more apparent than real, that under ORCP 22C. the client can file a third party complaint against the attorney maintaining that his attorney, and not he, is liable for plaintiff's damages because the client was only following his attorney's advice.

[3] It happened in *Davies* that the first action between the corporation and decedent was settled with decedent paying a sum back to the corporation. This meant that the legality of the stock payments, and hence the propriety of the attorneys' advice, had yet to be resolved. Until the action was settled, however, there existed the possibility that the stock payment would be found legal, a determination that would eliminate the possibility of decedent's malpractice claim.

the contrary, it was precisely that knowledge that led her to resist conveying the property at the sale price.

Plaintiff acknowledges that she became aware of the error in valuation four months after she signed the contract to convey. At that point, plaintiff was contractually obliged to convey the property at a loss of approximately $235,675, a loss she attributed to defendant's faulty valuation. Plaintiff nowhere explains why her cause of action did not accrue at that time. She points to the twists and turns of the contract defense she subsequently chose to pursue. However, the outcome of the contract dispute is pertinent only to the possibility that plaintiff's damages might be mitigated by events subsequent to her discovery of harm. Plaintiff's argument that she sustained no harm until the extent of her damage was ascertained, or, in this case, until an appellate decision finally forced her to convey the property, mixes two discrete concepts, the occurrence of harm and the extent of damages. We have stated that "[i]t is immaterial that the extent of damages could not be determined at the time of the [tort]" for purposes of determining when the statute of limitation commenced to run. *Industrial Plating Co. v. North,* 175 Or 351, 354, 153 P2d 835 (1944). Plaintiff's contractual obligation itself constituted harm. The earnest money agreement was an established liability, notwithstanding potential contract defenses. *See Hoffman v. Toft,* 70 Or 488, 142 P 365 (1914). The legal costs plaintiff assumed to resist her contractual duty to convey likewise constituted harm. *U.S. Nat'l Bank v. Davies, supra. See also Niedermeyer v. Dusenbery,* 275 Or 83, 549 P2d 1111 (1976). Her discovery of this harm in May, 1978, commenced the running of the limitation period.

Affirmed.